UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**M.M.M., ON BEHALF OF HIS MINOR
CHILD, J.M.A.**
409 FM 1144 Karnes City, TX, 78118

**I.A.T., ON BEHALF OF HIS MINOR
CHILD, E.A.H.**
409 FM 1144 Karnes City, TX, 78118

**N.B., ON BEHALF OF HER MINOR
CHILD, D.B.G.**
1925 TX-85, Dilley, TX 78017

**P.A.P., ON BEHALF OF HER MINOR
CHILD, G.M.A.**
1925 TX-85, Dilley, TX 78017

**G.C.H., ON BEHALF OF HIS MINOR
CHILD, A.M.C.**
1925 TX-85, Dilley, TX 78017

**L.C.O, ON BEHALF OF HER MINOR
CHILD, L.A.A.**
1925 TX-85, Dilley, TX 78017

                                        **Plaintiffs,**


- v. –


**JEFFERSON BEAUREGARD SESSIONS
III, ATTORNEY GENERAL OF THE
UNITED STATES,**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530;

**CIVIL ACTION NO. _____**


**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**KIRSTJEN NIELSEN, SECRETARY OF
THE U.S. DEPARTMENT OF
HOMELAND SECURITY,**
25 Murray Lane SW
Washington, DC 20528;

**ALEX AZAR, SECRETARY OF THE
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,**
200 Independence Avenue SW
Washington, DC 20201;

**RONALD VITIELLO, ACTING
DIRECTOR OF U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT,**
500 12th Street SW
Washington, DC 20536;

**L. FRANCIS CISSNA, DIRECTOR OF
U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,**
20 Massachusetts Avenue NW
Room 4210, MS: 2120
Washington, DC 20529;

**KEVIN K. MCALEENAN,
COMMISSIONER OF U.S. CUSTOMS
AND BORDER PROTECTION,**
1300 Pennsylvania Avenue NW
MS: 1345
Washington, DC 20229;

**SCOTT LLOYD, DIRECTOR OF THE
OFFICE OF REFUGEE
RESETTLEMENT,**
Mary E. Switzer Building
330 C Street SW
Washington, DC 20201;

**DANIEL A. BIBLE, DIRECTOR OF ICE
SAN ANTONIO FIELD OFFICE**,
1777 NE Loop 410, Floor 15
San Antonio, TX 78217;

**U.S. DEPARTMENT OF HOMELAND
SECURITY,**
245 Murray Lane SW
Mailstop 0485
Washington, DC 20528;

**U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,**
500 12th Street SW
Washington, DC 20530;

**U.S. CUSTOMS AND BORDER
PROTECTION,**
1300 Pennsylvania Avenue NW
Washington, DC 20229;

**U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,**
20 Massachusetts Avenue NW
Washington, DC 20529;

**U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,**
200 Independence Avenue SW
Washington, DC 20201;

**OFFICE OF REFUGEE
RESETLEMENT,**
Mary E. Switzer Building
330 C Street SW
Washington, DC 20201,

                                        **Defendants.**

## INTRODUCTION

1.      This case concerns the U.S. government's denial of mandatory asylum procedures

to minor migrant children, including Plaintiffs, who were forcibly and unlawfully separated from

their parents and have been or will be reunified with them pursuant to the preliminary injunction

issued by the court in *Ms. L v. U.S. Immigration and Customs Enforcement ("ICE"); et al.*, Case

No. 18-cv-00428-DMS (MDD) (S.D. Cal. June 26, 2018). Under the U.S. government's stated policy of immediate removal following reunification, Plaintiffs – and many other child migrants like them – are in imminent danger of being deported back to life-threatening conditions in their home countries, without any final order of removal and without ever having been given the chance to access asylum procedures that are guaranteed by both statute and the Constitution.

2.    Many of the families who were subject to the U.S. government's "zero tolerance" separation policy were apprehended at or near the U.S. border with Mexico after fleeing life-threatening conditions in certain Central American countries, including El Salvador, Guatemala, and Honduras. Many of these families, including Plaintiffs' families, came to the U.S. seeking refuge, and their forcible separation has caused both parents and children severe trauma and distress.

3.    In its order granting a preliminary injunction against the U.S. government, the district court in *Ms. L.* recently catalogued some of this trauma. The court there determined that the separation policy likely violated the Due Process Clause of the Fifth Amendment because it was likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency." *Ms. L. v. U.S. Immigration and Customs Enforcement ("ICE"), et al.*, No. 18cv0428 DMS (MDD), 2018 WL 3129486, at \*8, 1165–66 (S.D. Cal., June 26, 2018) (internal quotations omitted). Given the likely unconstitutionality of the separation policy, the court ordered the U.S. government to stop separating families immediately, and to reunify all families that had already been separated by July 26, 2018. *See id.* at \*12.

4.      Having been ordered to end the unlawful separations, Plaintiffs are informed and believe that Defendants intend to embark on a policy of immediately deporting reunified families in which one of the parents has been given an expedited removal order, without honoring the minor children's individually vested rights to seek asylum.   In furtherance of this policy, immigration officials have presented parents separated from their children with "removal forms" in which they must choose between being deported alone or with their child.  The apparent goal of these forms is to pressure or coerce the parents to abandon not only their own rights, but also their children's rights to seek asylum.  Upon information and belief, the government plans to rely on these waivers to immediately deport children who do not even have a final order of removal.

5.      "A deportation hearing involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned, perhaps to life itself." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950).  And as the Supreme Court has recognized, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (internal quotation omitted).

6.      Here, the planned removal of these minor children and their parents without honoring the children's rights to apply for asylum deprives the children of their fundamental right to due process and to seek asylum prior to repatriation.  Plaintiffs therefore ask this Court to invalidate and enjoin the U.S. government's unlawful policy to remove families before granting Plaintiffs access to the asylum procedures to which they are entitled by law.  Plaintiffs request this relief on behalf of themselves and on behalf of a nationwide class, as set forth below.

## JURISDICTION AND VENUE

7.      This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States.  Specifically, this action arises under the Immigration and Nationality Act ("INA"), the Fifth Amendment to the Constitution, the Administrative Procedure Act ("APA"), and the Mandamus Act.

8.      Venue is proper under 28 U.S.C. § 1391(e) because several of the Defendants reside in this District, and upon information and belief a substantial portion of the relevant facts occurred within this District, including the decision to implement the policy changes challenged in this action.

9.      Jurisdiction and venue also are proper under 8 U.S.C. § 1252(e)(3), insofar as Plaintiffs' claims arise from or relate to the implementation or operation of an expedited removal order under 8 U.S.C. § 1225(b)(1), and/or in the event that the Court is reviewing a decision by the Attorney General to invoke the provisions of that section.  In either case, jurisdiction is proper under 8 U.S.C. § 1252(e)(3) because this action is a systemic challenge to the legal validity of written policies and procedures issued by or under the authority of the Attorney General that have been used to remove migrant children who were forcibly separated from their families upon apprehension at or near the U.S. border with Mexico and who are now reunited with parents who have received expedited removal orders.

6

**PARTIES**

10.    Each Plaintiff is a minor child and brings this action by and through his or her

parent and next friend, in accordance with Federal Rule of Civil Procedure 17(c).

11.    J.M.A. emigrated to the U.S. from Honduras with his father and is currently

detained at the Karnes County Residential Center in Karnes, Texas.

12.    E.A.H. emigrated to the U.S. from Honduras with his father and is currently

detained at the Karnes County Residential Center in Karnes, Texas.

13.    D.B.G. emigrated to the U.S. from Honduras with her mother and is currently

detained at the South Texas Family Residential Center in Dilley, Texas.

14.    G.M.A. emigrated to the U.S. from Honduras with her mother and is currently

detained at the South Texas Family Residential Center in Dilley, Texas.

15.    A.M.C. emigrated to the U.S. from Honduras with his mother and is currently

detained at the South Texas Family Residential Center in Dilley, Texas.

16.    L.A.A. emigrated to the U.S. from Guatemala with her mother and is currently

detained at the South Texas Family Residential Center in Dilley, Texas.

17.    Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the

Attorney General of the United States.  In this capacity, he is responsible for administering U.S.

immigration laws pursuant to 8 U.S.C. § 1103 and has the authority to grant non-citizens asylum

and other relief.

18.    Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the

U.S. Department of Homeland Security.  In this capacity, she directs the sub-agencies within the

U.S. Department of Homeland Security: U.S. Immigration and Customs Enforcement, U.S.

Citizenship and Immigration Services, and U.S. Customs and Border Protection.  Secretary

7

Nielsen is responsible for administering the U.S. immigration laws pursuant to 8 U.S.C. § 1103 and has the authority to grant non-citizens asylum and other relief.

19.     Defendant Alex Azar is sued in his official capacity as the Secretary of the U.S. Department of Health and Human Services.  In this capacity, he is responsible for overseeing the agency charged with enhancing and providing effective health and social services in the United States.

20.     Defendant Ronald Vitiello is sued in his official capacity as the Acting Director of the U.S. Immigration and Customs Enforcement.  In this capacity, he is responsible for civil and criminal enforcement of federal laws governing border control, customs, trade and immigration.

21.     Defendant L. Francis Cissna is sued in his official capacity as the Director of U.S. Citizenship and Immigration Services.  In this capacity, he is responsible for overseeing the officers who conduct applicants' credible fear interviews and adjudicate applicants' asylum claims.

22.     Defendant Kevin K. McAleenan is sued in his official capacity as the Commissioner of U.S. Customs and Border Protection.  In this capacity, he oversees the agency responsible for securing U.S. borders regarding trade, immigration, and agricultural protection.

23.     Defendant Scott Lloyd is sued in his official capacity as the Director of the Office of Refugee Resettlement. In this capacity, he is responsible for the agency that provides care and placement for children who have entered the U.S. without a guardian.  His agency is also responsible for the care of children who were separated from their adult guardians at the U.S. border pursuant to the administration's "zero tolerance" policy.

24.     Defendant Daniel A. Bible is sued in his official capacity as the Director of the San Antonio Field Office of U.S. Immigration and Customs Enforcement.

25.    Defendant U.S. Department of Homeland Security ("DHS") is the government agency responsible for enforcing the immigration laws of the United States.

26.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS responsible for carrying out removal orders and overseeing immigration detention in the United States.

27.    Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS responsible for the initial processing and detention of non-citizens who are apprehended at or near U.S. borders.

28.    Defendant U.S. Citizenship and Immigration Services ("CIS") is the sub-agency of DHS responsible for conducting interviews of individuals apprehended at the border in order to determine whether those individuals have a credible or reasonable fear of persecution in their home countries and should be permitted to seek asylum in the United States.

29.    Defendant U.S. Department of Health and Human Services ("HHS") is a department of the executive branch of the Government that has been delegated with authority over "unaccompanied minors."

30.    Defendant Office of Refugee Resettlement ("ORR") is a program of the Administration for Children and Families, an office of HHS responsible for providing care of and placement for "unaccompanied" non-citizen children who come to the United States.

## FACTS

### A. The U.S. Government's Deliberate and New Immigration Policy Forcibly Separated Child Migrants from Their Parents.

31.    Earlier this year, the U.S. government initiated a "zero tolerance" policy on immigration, pursuant to which the U.S. government engaged in a widespread practice of separating migrant families who had been detained after crossing the U.S. border with Mexico.

32.     Over the course of several months, the U.S. government, including ICE, forcibly separated or oversaw the forcible separation of *thousands* of child migrants from their parents, dividing families with small children (including infants) who were seeking asylum. The separated children were transferred to the custody of ORR for placement elsewhere in the United States, in some cases hundreds of miles from their parents who remained in detention. Many families were separated for months, with little or no ability to communicate with one another.

33.     The express purpose of the "zero tolerance" policy, according to Attorney General Sessions, was to deter migrant families from entering the United States without authorization.[1]

**B.  *A Federal Court Found that the Separation Policy Likely Violates the Parents' Fifth Amendment Right to Family Integrity and Ordered the Federal Government to Reunify Families by July 26.***

34.     On June 26, 2018, Judge Dana Sabraw of the District Court for the Southern District of California issued a preliminary injunction enjoining the U.S. government from detaining migrant parents without and apart from their minor children, and ordered the U.S. government to reverse the effects of its separation policy by reuniting families who had been separated within 30 days, absent a determination that the parent was unfit or presents a danger to the child. *See Ms. L*, 2018 WL 3129486 at *12.

35.     In finding that a preliminary injunction was warranted based on several months of litigation and a robust record before the court, Judge Sabraw determined that the U.S.

---

[1]     U.S. Att'y Gen. Jeff Sessions, *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions. As the Attorney General explained: "If you cross this border unlawfully, then we will prosecute you. It's that simple. If you smuggle illegal aliens across our border, then we will prosecute you. If you are smuggling a child, then we will prosecute you *and that child will be separated from you as required by law*. . . . So if you're going to come to this country, come here legally. Don't come here illegally."

government's separation policy likely violated the parents' Fifth Amendment right to family integrity because it could be considered:

> so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, . . . interferes with rights implicit in the concept of ordered liberty, . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency.

*Id.* at *8

36.     In evaluating whether the migrant parents would suffer irreparable injury without an injunction, Judge Sabraw also found that "the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them," and that "separating children from their parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." *Id* at 9–10 (internal quotations omitted).

37.     Finally, Judge Sabraw noted his disappointment with the U.S. government's actions: "The facts set forth before the Court portray reactive governance—responses to address a chaotic circumstance of the Government's own making.  They belie measured and ordered government, which is central to the concept of due process enshrined in our Constitution.  This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children." *Id.*

38.     Unfortunately, these same words continue to describe the U.S. government's actions following the reunification of families, as described in more detail below.

### C.  *In the Wake of the* Ms. L *Order, Defendants Are Attempting to Effectuate the Immediate Deportation of Hundreds of Reunified Families Through Unlawful Measures.*

39.     Pursuant to the preliminary injunction entered in *Ms. L*, Defendants were supposed to reunify all separated families by July 26, 2018.  Although Defendants are still in the

process of reunification, as ordered, it is apparent that Defendants intend to follow a policy to immediately remove any reunified families in which a parent has received an expedited removal order under 8 U.S.C. § 1225(b)(1), without giving the child access to procedures that are required by statute and the Constitution.

40.     This policy, which is demonstrated by the statements made by the U.S. government officials and other sources discussed below, is being carried out in two steps. First, the U.S. government has pressured parents with final removal orders into waiving their children's right to remain in removal proceedings under Section 240 of the INA, so that the U.S. government can extract the children from Section 240 proceedings and deport them under a pretense of voluntary return. Second, once reunited with their parents in detention, the U.S. government has refused to give children access to asylum procedures under Section 235. With these two steps—both of which are illegal—the U.S. government is preparing to deport the families forthwith, without ever giving the child the chance to seek asylum.

41.     The U.S. government's recent statements on reunification, including statements from the president himself, show that Defendants' goal is to deport these reunified families as soon as possible. On June 23, 2018, DHS released a Fact Sheet entitled "Zero-Tolerance Prosecution and Family Reunification," which lays out the agency's plans for family reunification. By its own terms, the DHS Fact Sheet makes clear that the reunification process is designed "to ensure that those adults who are subject to removal are reunited with their children *for the purposes of removal.*"[2] The Fact Sheet makes no provision for migrant children who are entitled to—but have never received—an interview with an asylum officer prior to being deported, or a hearing before an immigration judge under Section 240. Rather, it explicitly states

---

[2]     *Fact Sheet:  Zero-Tolerance Prosecution and Family Reunification*, Dep't of Homeland Security (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification (emphasis added).

that "ICE will seek to reunite verified family units and *link their removal proceedings* so that *family units can be returned to their home countries together*."[3]

42.     As the court in *Ms. L* described it, "the Fact Sheet focuses on reunification 'at time of removal[,]' stating that the parent slated for removal will be matched up with their child at a location in Texas *and then removed*." *Ms. L*, 2018 WL 3129486, at *5 (emphasis added and internal citations omitted). Indeed, the *Ms. L* court noted that "it is undisputed ICE has no plans or procedures in place to reunify the parent with the child *other than arranging for them to be deported together after the parent's immigration case is concluded*." *Id.* (emphasis added and internal quotation marks omitted). There is no mention of whether a *child's* rights to their own immigration and asylum procedures will be upheld prior to removal.

43.     Perhaps most tellingly, on June 24, 2018, President Trump tweeted that "[w]hen somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."[4] As Judge Michael Simon of the District Court for the District of Oregon put regarding this statement, "[t]he position of the United States Government appears to be that aliens are not entitled to due process in immigration proceedings." *Innovation Law Lab v. Nielsen*, ___ F. Supp. 3d ___ , No. 3:18-CV-01098-SI, 2018 WL 3114530, at *6 (D. Or. June 25, 2018).

44.     The policy of immediately deporting these families upon reunification is also reflected in recent filings in *Ms. L*. In the ACLU's Motion for Stay of Removal and Emergency TRO Pending Ruling on the Stay Motion, the ACLU cites "persistent and increasing rumors – which Defendants have refused to deny – that mass deportations may be carried out imminently and immediately upon reunification." Pls.' Reply in Supp. of Mot. for Stay of Removal at 1, *Ms.*

---

[3]     *Id.* (emphasis added).
[4]     Donald J. Trump (@realDonaldTrump), Twitter, (June 24, 2018 8:02 AM), https://twitter.com/realDonaldTrump/status/1010900865602019329.

*L. v. U.S. Immigration & Customs Enforcement*, No. 18-0428 (S.D. Cal. July 25, 2018), ECF No. 154.

45.    In fact, Defendants' policy includes attempting to get parents to waive their children's legal rights in order to facilitate families' immediate removal.  On June 24, 2018, a DHS official told MSNBC Correspondent Jacob Soboroff that parents separated from their children "were quickly given the option to sign paperwork leading to deportation.  Many chose to do so."[5]  On the same day, the *Washington Post* reported comments from an interview with a senior administration official who declined to be identified:

> [O]fficials never intended to send busloads of children to [the Port Isabel detention facility] for a massive reunion.  Instead, the official said, they plan to reunite families on an individual basis once a parent has lost his or her deportation case. *Parents may ask for their children to join them so that they can be deported together,* the official said.[6]

46.    Indeed, following the reunification order in *Ms. L*, ICE began providing parents subject to final orders of removal with a "Separated Parent's Removal Form" (the "Removal Form") that offered them two choices: (1) reunification with their minor children "for the purpose of repatriation to" the parent's country of citizenship, or (2) repatriation without reunification.  *See* Exhibit 1 (Separated Parent's Removal Form).  The forms do not recognize that the children have independent rights to seek asylum, and a right to be accompanied by their parent(s) pending the outcome of those proceedings.   The only opportunity for family reunification afforded by the Removal Form requires parents to consent to repatriation together.  As such, the Removal Form coerces parents into choosing the second option of being deported

---

[5]    Jacob Soboroff (@jacobsoboroff), Twitter (June 24, 2018, 5:29 AM), https://twitter.com/jacobsoboroff/status/1010862394103328771.
[6]    Maria Sacchetti et al., *Sen. Warren visit detention center, says no children being returned to parents there,* The Washington Post (June 24, 2018), https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html?utm_term=.7a9ca477bddd (emphasis added).

together, unknowingly and unlawfully waiving their children's legal right to pursue asylum. These coercive forms are thus meant to facilitate the immediate deportation of reunified families in which the parent has received (or will receive) an expedited removal order.

47.    In their Reply in Support of the Motion for Stay of Removal in *Ms. L*, the ACLU identified at least 27 instances in which parents who wished to be reunited with their children were pressured and/or misled into signing Removal Forms. These parents were instructed to sign the English-language Removal Forms without being told that they would waive their right to be reunited with their children. In one instance, a Guatemalan father, a native Acateco speaker who speaks only limited Spanish and cannot read or write in any language, signed a Removal Form in English that he was told would allow his daughter to be released to family members in the United States without knowing that he was waiving his right to be reunited with her. Pls.' Reply in Supp. of Mot. for Stay of Removal at 20-21, *Ms. L. v. U.S. Immigration & Customs Enforcement*, No. 18-0428 (S.D. Cal. July 25, 2018), ECF No. 154. In another instance, a father who was afraid to return his daughter to Guatemala was told that the only way she could remain in the United States was if he signed an English-language Removal Form, which he did not understand. *Id.* at 31-32. The entire interaction lasted approximately one minute, and he was not given the opportunity to review the document or ask questions about it. *Id.* at 32. He was later told to sign a Spanish-language document acknowledging that he understood the Removal Form, which he signed because he believed he had no choice if he wanted his daughter to remain in the United States. *Id.*

48.    Upon information and belief, the U.S. government is treating the selection of reunification and deportation as a waiver of the child's independent rights to seek asylum in proceedings under Section 240 of the INA. Indeed, prior to their reunification, the U.S.

15

government had classified separated minors as "unaccompanied" minors. An unaccompanied child migrant is defined as a person who, among other things, is under age 18 and "with respect to whom there is no parent or legal guardian in the United States." *See* 6 U.S.C. § 279(g). Unaccompanied child migrants are not subject to the same expedited removal proceedings under Section 235 and are instead afforded direct access to an asylum officer for removal proceedings pursuant to Section 240 of the INA. *See* 8 U.S.C. § 1158(b)(3)(C). This process reflects a policy decision that "unaccompanied minors should not be placed in expedited removal proceedings, but should instead be entitled to the procedural safeguards of a full removal hearing under INA § 240." *Representing Minors in Removal Proceedings – Training Materials*, Center for Human Rights and Constitutional Law (Nov. 18, 2016), https://www.centerforhumanrights.org/PDFs/11-18-16 Handout_Minors_in_Removal_Proceedings.pdf.

49.     After Plaintiffs and other separated children became "unaccompanied," they were transferred to the custody of the ORR, and at least some were issued Notices to Appear (NTAs) in immigration court for removal proceedings under Section 240, separate and apart from their parents' expedited removal proceedings under Section 235. Consistent with the INA and their due process rights, these removal proceedings under Section 240 would have (and should have) afforded the minors the opportunity to petition for any and all forms of immigration relief before the immigration court, and would have entitled them to certain procedural protections while doing so, such as the right to be represented by counsel.

50.     However, the U.S. government has since reversed course, revoking NTAs or simply never filing them with the immigration court, presumably on the basis of the parental "waivers" discussed above. The parents do not have the legal authority to waive their child's rights to seek asylum under the INA, particularly under these circumstances. Parents have been

coerced or mislead into signing the waivers under the threat of permanent separation from their children, to waive rights the parents do not understand, for children who have rights *independent* of the parents' rights under the INA. Parents are not executing the waiver knowingly, intelligently, and voluntarily. As another judge on this Court concluded just last week: "Simply put, the form is not worth the paper it is written on." Mem. Op. and Order at 5, *M.G.U. v. Kirstjen Nielsen*, Case No. 1:18-cv-1458-PLF (D.D.C. July 16, 2018) ECF No. 44.

51.    Nevertheless, by revoking or never filing the NTAs, the U.S. government has effectively and unlawfully terminated the children's removal proceedings under Section 240, and the access to asylum procedures that Section 240 provides. Thus, through the operation of the improper waiver forms, separated minors have been stripped of the opportunity to petition for asylum through Section 240 proceedings.

### D.    The Government is Also Denying Children Access to Alternative Asylum Procedures Guaranteed by Statute and the Constitution.

52.    Having improperly removed Plaintiffs and other reunified children from proceedings under Section 240, the U.S. government is even denying them access to asylum procedures under Section 235, effectively leaving them without access to asylum procedures at all. As a result, the minor children in these families – many of whom came to the U.S. to escape horrifying violence that they themselves face – have been completely deprived of the right to seek asylum, even though their individual right to seek asylum is guaranteed by Sections 235 and 240 of the INA and the Fifth Amendment of the Constitution.

53.    Prior to the U.S. government's separation policy, Plaintiffs and other children would have been subject to proceedings under Section 235. These procedures – referred to as "expedited removal proceedings" and reserved for migrants who are detained within 100 miles of the boarder and within 14 days of their entry – allow for expedited removal without appearing

17

before an immigration judge. However, as part of the expedited removal process, Section 235 of the INA *requires* an immigration officer to refer a migrant to an asylum officer if the migrant indicates either intent to apply for asylum or fear of persecution in his or her home country. *See* 8 U.S.C. § 1225(b)(1)(A).

54.     The asylum officer must then conduct a "credible fear" interview. If the asylum officer determines that the migrant has a "credible fear" of persecution, the migrant *cannot* be deported pursuant to an expedited removal order under Section 235; instead, the migrant "shall be detained for further consideration of the application for asylum" pursuant to full removal proceedings under Section 240, including a hearing before an immigration judge. *Id.* at § 1225(b)(1)(B)(ii); *see also* 8 C.F.R. § 208.30(f); 8 U.S.C. § 1229a.

55.     In preparing for a "credible fear" interview with an asylum officer, the migrant may consult with persons of his or her choosing. *See* 8 U.S.C. § 1225(b)(1)(B)(iv). If a migrant detained at the border demonstrates a "credible fear" of persecution, then the spouse and children of the migrant who arrived with them in the United States are included in that determination and permitted full removal proceedings under Section 240, and the ability to petition for asylum that comes with it. *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.30(b). Likewise, if a child migrant independently demonstrates a "credible fear," that positive finding is imputed to the parent, and the entire family is permitted full removal proceedings under Section 240.

56.     Thus, for families subject to expedited removal, the credible fear interview is the family's sole access point to asylum.

57.     Here, however, Plaintiffs and other minor children who were taken from their families under the U.S. government's separation policy have been completely foreclosed from ever receiving a credible fear interview, even where their entitlement to such an interview has

been triggered.  Nor were they able to participate in any credible fear interviews received by their parents.

58.    Instead, following separation from their families, the minor children were placed in their own immigration proceedings under Section 240 of the INA discussed above, separate and apart from those against their parents.

59.    Following reunification with their parents, and after the children's NTAs for Section 240 proceedings were withdrawn or never filed, the U.S. government failed to afford them even expedited rights under Section 235 to seek asylum.  Children in this position are being denied "credible fear" interviews, even if they triggered the statutory provision entitling them to such an interview.  For example, ICE has completely failed to respond to requests for "credible fear" interviews made on behalf of at least four of the Plaintiffs in writing.  And CIS, the sub-agency responsible for conducting credible fear interviews, confirmed in writing that Plaintiffs J.M.A. and E.A.H. have not been referred for credible fear interviews.  Accordingly, these minor children are in imminent danger of being deported without ever having the opportunity to access statutory asylum procedures required by law.  Indeed, J.M.A.'s father and E.A.H.'s father were contacted by the Honduran consulate, which informed them that they would be deported "soon."

60.    Moreover, many younger children and infants can only access the credible fear process through their parents, who participate in the credible fear interview on the family's behalf.  A positive result in a parent's credible fear interview is imputed to the whole family, and a parent may testify on behalf of his or her child.  But many of these parents – including Plaintiffs' parents – were in such emotional distress following separation from their children that they were too distraught to meaningfully participate in their credible fear interviews, and thus received a negative decision.  *See, e.g.*, Angelina Chapin, *Separated Parents Are Failing Asylum*

*Screenings Because They're So Heartbroken*, Huffington Post (June 30, 2018), https://www.huffingtonpost.com/entry/separated-parents-too-grief-stricken-to-seek-asylum-experts-say_us_5b379974e4b08c3a8f6ad5d9. In many circumstances, their children could have provided compelling evidence of the basis for the whole family's credible fear. Yet these parents are not being granted new "credible fear" interviews following reunification. Thus, many young children have been denied access to asylum because their parents' interviews were tainted by the unlawful separation and therefore fundamentally unfair.

61. In light of the foregoing, Plaintiffs and other child migrants have been unlawfully denied the opportunity to apply for asylum. The U.S. government's policy of denying these children access to the credible fear process and seeking to deport them with their parents as soon as possible violates the INA and their Constitutional rights.

62. Upon information and belief, and based on facts stated above, DHS, ICE, and other Defendants promulgated, at some point after in June, 2018, internal written directives implementing the reunification order in *Ms. L* and Executive Order 13841. *See* Executive Order 13841, Affording Congress an Opportunity to Address Family Separation, 83 Fed. Reg. 29,435 (June 20, 2018) (stating that it is "the policy of this Administration to maintain family unity, including detaining alien families together where appropriate and consistent with law and available resources."). These directives ordered DHS and ICE personnel to effectuate the deportation of families as soon as practically possible following reunification by securing the parent's agreement to be deported with their child, extracting the child from removal proceedings under Section 240, and placing the child back in the custody of the parent so that they could be prepared for immediate deportation. These directives apply to all members of reunified families, including to minor children who do not have final orders of removal and have indicated either an

20

intention to apply for asylum or who have expressed a fear of persecution; these directives do not provide for such children to remain in removal proceedings under Section 240 with the assistance of their parent (where they would have the opportunity to petition for asylum) or to have an interview with an asylum officer prior to being deported, as required by law. These written directives have been implemented for the first time in the last 60 days and are within the sole possession and control of Defendants.

63.     Upon information and belief, the only impediment currently preventing the immediate deportation of hundreds of families – including Plaintiffs – is the temporary stay imposed by the court in *Ms. L* on July 16, 2018. Order Granting Pls.' Mot. for Emergency TRO Pending Ruling on Mot. to Stay and Amending July 13, 2018 Order Following Status Conference, *Ms. L v. ICE*, No. 18cv0428 DMS (MDD) (S.D. Cal. July 16, 2018), ECF 116. The *Ms. L* court ordered a temporary halt to deportations of reunited families at the request of the ACLU, and is holding a second hearing on the stay today, July 27, 2018. If the court does not continue the stay, upon information and belief, the U.S. government will immediately begin to deport reunited families pursuant to removal orders that have been issued individually to the parents.

### E.  *The Conditions in Countries From Which Plaintiffs Fled Are Particularly Violent.*

64.     Five of the six Plaintiffs, and many other migrant children like them, fled Honduras with their parents. Honduras is characterized by constant violence, a destabilizing government, and official corruption. It is a particularly dangerous place for young people. In 2017, it was listed as the single most violent country for children under nineteen years old with a

homicide rate of more than thirty children per 100,000 inhabitants – about ten times higher than the global average.[7]

65.    Two rival gangs, Mara Salvatrucha ("MS-13") and the 18th Street Gang, fight for control over territory and recruits in urban and rural areas of Honduras alike.[8]  These gangs often target children as their weapons of war because national anti-gang legislation carries less severe penalties for minors involved in gang activity than for adults.[9]  These young recruits are often forced to collect "taxes" or sell drugs, and those who refuse are often killed.[10]

66.    Children living in these gang-riddled areas are doubly targeted, not only by gangs but by law enforcement officers who regard them as potential criminals or gang members.[11]  And corruption among Honduran law enforcement has been widely reported; police officers who do not target young males as suspected gang members are often themselves working with the gangs.[12]

67.    These conditions are by no means limited to Honduras.  They extend to Guatemala, El Salvador, and throughout Central America as well.[13]

---

[7]    Parker Asmann, *Ten Countries with Highest Child Homicide Rates All in LatAM: Report*, InSight Crime (June 6, 2017), https://www.insightcrime.org/news/brief/ten-countries-highest-child-homicide-rates-all-latam-report/.

[8]    *See, generally*, *Gangs in Honduras*, Insight Crime (Apr. 21, 2016), http://bit.ly/2nl8ov0.

[9]    U.S. Dep't of State, Honduras 2016 Human Rights Report, 28 (2016) https://www.state.gov/documents/organization/265808.pdf..

[10]    UN Human Rights Council, *Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions on his Mission to Honduras* at 6, A/HRC/35/23/Add.1 (June 2017).

[11]    *Id.* at 14.

[12]    Sarah Chayes, Carnegie Endowment for International Peace, *When Corruption is the Operating System: The Case of Honduras*, 29 (May 2017) https://carnegieendowment.org/files/Chayes_Corruption_Final_updated.pdf (stating "[o]f greater concern are the reports we heard in interviews of collusion between police and the youth gangs whose depredations it is their job to curb.").

[13]    *See* UN High Commissioner for Refugees (UNHCR), *Eligibility Guidelines for Assessing the International Protection Needs of asylum-seekers from Guatemala* at 7, HCR/EG/GTM/18/01 (Jan. 2018), http://www.refworld.org/docid/5a5e03e96.html [accessed 26 July 2018]; UN High Commissioner for Refugees (UNHCR), *UNHCR Eligibility Guidelines for*

### F. Plaintiffs Seek Asylum in the United States, But Defendants Are Depriving Them of Their Rights and Opportunity to Pursue Their Claims.

68.     J.M.A. is a 13 year-old child seeking asylum in the United States.  J.M.A. is from Honduras and traveled to the United States to seek asylum because of threats of violence and mortal danger made against him and his father by the 18th Street Gang.  Indeed, J.M.A.'s father bears scars from a previous knife attack.  J.M.A.'s native language is Spanish.

69.     J.M.A. and his father were apprehended by border patrol agents around Eagle Pass, Texas on or about May 20, 2018.  J.M.A. and his father were initially detained together in the *hielera*, or "ice box," with other migrants for approximately 8 – 10 hours, where J.M.A.'s father was fingerprinted and photographed.  J.M.A.'s father and other parents were then taken from the room.   When he returned, J.M.A.'s father informed J.M.A. that the two would be separated, and that he did not know where J.M.A. would be taken.  J.M.A. and his father shared a tearful goodbye before J.M.A. was then taken from the room, loaded into a van with other migrant children, and transported to a separate facility.

70.     When J.M.A. asked officials about his father, they told J.M.A. simply that he was "going to another place."  J.M.A. was not permitted to bathe or change clothes, and officials subjected him to security screenings for weapons.  Upon separation, J.M.A. was deemed and treated as an "unaccompanied minor." On May 21, 2018, J.M.A. was issued an NTA for proceedings under Section 240 of the INA.  J.M.A. was taken first to another "ice box" for children, where the children were grouped by gender and age, then to a shelter in San Antonio, Texas where he was detained for 58 days.  While detained, J.M.A. had some telephonic contact with his family.

*Assessing the International Protection Needs of Asylum-Seekers from El Salvador* at 4–6, HCR/EG/SLV/16/01 (Mar. 15, 2016), http://www.refworld.org/docid/56e706e94.html [accessed 26 July 2018]

71.    J.M.A. suffered tremendous fear, anxiety, and uncertainty during this detention. For the duration, J.M.A. did not know whether he would ever see his father again, and officials would not inform him of his father's status.   Indeed, J.M.A. was detained for over a month before being permitted a brief, two-minute phone call with his father.  While J.M.A. was relieved to hear his father's voice following such prolonged silence, whether the two would ever see each other again remained unclear.

72.    On July 17, 2018, per the court order in *Ms. L*, J.M.A. was reunified with his father.  Since being reunified he does not want to leave his father's side and is afraid of being separated from his father again.  By the time J.M.A. and his father were reunified, J.M.A.'s father had already independently sat through a credible fear interview.   On May 22, 2018, J.M.A.'s father was issued an expedited order of removal.

73.    After reunification, and through an attorney, J.M.A. requested the opportunity to explain his fear of returning to Honduras to immigration or asylum officers, but J.M.A. has not received a response to that request.  J.M.A. is not independently subject to an expedited order of removal and is not named on the order issued to his father.  Nevertheless, upon information and belief, Defendants intend to imminently deport J.M.A. along with his father.  J.M.A.'s father was contacted by the Honduran consulate, which told him that they would be deported "very soon."

74.    J.M.A. is afraid to return to Honduras because he and his father might be threatened, assaulted, or killed by the 18th Street Gang – the same gang that has previously threatened them, and maimed J.M.A.'s father in a knife attack.

75.    E.A.H. is a six year-old child seeking asylum in the United States.  E.A.H. is from Honduras.  He and his father traveled to the United States to seek asylum because gangs were

threatening his father's life. E.A.H.'s native language is Spanish. E.A.H. and his father were apprehended by U.S. border patrol agents in McAllen, Texas on or about June 12, 2018.

76.    On June 13, 2018, E.A.H. was forcibly separated from his father. On that day, E.A.H.'s father was told he was going to court and that E.A.H. would be there waiting for him afterwards. When he returned, however, E.A.H. had already been taken away, and officers could not tell him where his son had gone or what would happen to him. E.A.H. was taken to Harlingen, Texas where he was detained for 33 days. While detained, E.A.H. had only very limited contact with his family. Upon separation, E.A.H. was deemed and treated as an "unaccompanied minor." On June 15, 2018, E.A.H. was issued an NTA for proceedings under Section 240 of the INA.

77.    E.A.H. and his father were separated for 33 days. They were not allowed to speak to each other until nine or ten days after they were first separated. When E.A.H.'s father started speaking to E.A.H., the child started crying uncontrollably. His father tried to calm him down, but said it was too painful for him to hear his son so upset and not be able to hug him or console him or do anything but talk. E.A.H.'s father asked the guard to end the phone call early because he could not bear it and did not want to put his son through so much pain any longer. He stated he had no idea if he would ever see his son again.

78.    On July 16, 2018, per the court order from *Ms. L*, E.A.H. was reunified with his father. By that time, however, E.A.H.'s father had already independently sat through the credible fear interview. He was not able to consult with E.A.H. prior to the interview. In addition, E.A.H.'s father was not able to concentrate on the questions during the credible fear interview because he was so worried about E.A.H., and could not think of anything but his son

25

and where he was.  He also did not understand what information he was expected to share in the interview.  On June 13, 2018, E.A.H.'s father was issued an expedited order of removal.

79.    E.A.H.'s father signed a document indicating that he wanted to be repatriated to Honduras with his son if it were so ordered.  He picked that option because the person that presented him with the document said that if he picked that option, he could be reunited with his son that same day.  He did not understand the form well.

80.    After being reunified with his father, and through their attorney, E.A.H. requested the opportunity to explain his fear of returning to Honduras to immigration or asylum officers, but E.A.H. has not received a response to that request.  E.A.H. is not independently subject to an expedited order for removal and is not named on the order issued to his father.  He has never had a court hearing or seen an immigration judge.  Nevertheless, upon information and belief, Defendants intend to deport E.A.H. along with his father very soon.

81.    E.A.H. is afraid to return to Honduras because he and his father might be harmed by the same gangs that previously targeted E.A.H.'s father for violence, or by the national political party that has threatened his father for refusing to support them.

82.    D.B.G. is a twelve year-old child seeking asylum in the United States.  D.B.G. is from Honduras and traveled to the United States to seek asylum because she is scared to return to Honduras.  D.B.G. fled from Honduras because a gang in Honduras threatened to kill her to retaliate against her mother, who made a police report after the gang murdered her second cousin.  D.B.G. is also scared to return to Honduras because her father is physically and emotionally abusive and threatened to kill her.  D.B.G.'s native language is Spanish.

83.    D.B.G. and her mother were apprehended by immigration officers in Texas on May 25, 2018, the day they entered the United States.  Upon apprehension and any time

26

thereafter, D.B.G. was never asked whether she feared returning to Honduras. From the time of apprehension, D.B.G. was forcibly separated from her mom.

84.     For approximately three days after apprehension, D.B.G. was kept in a cell at a building that she refers to as the "ice box, or *hielera*" because it was freezing. D.B.G. shared the cell in the *hielera* with more than 40 girls, between 8 and 17 years of age. The cell had no windows and the lights were kept on at all times, making it impossible to know whether it was night or day. The cell had concrete floors, and no tables or chairs. There was one toilet inside the cell, without a door. D.B.G. was not given a change of clothes, a tooth brush, or anything else.

85.     After approximately three or four days, D.B.G. was loaded into a car with her mother, and driven to another place called the dog pound, or *perrera*. She was placed in a cage with lots of other girls, who like her, came to the United States with their parents. Many of the guards in the *perrera* only spoke English and could not understand D.B.G. when she would ask them where her mother was. They would laugh at her, and then walk away. D.B.G. spent approximately seven or eight days in the *perrera*. From the *perrera*, D.B.G. was taken on an airplane to Miami, Florida. She was not told where she was going until they landed in Miami. D.B.G. had never been on a plane before. She was then taken to a shelter for children who do not have parents. The shelter was filled with termites.

86.     D.B.G. was separated from her mother for approximately 52 days, from approximately May 25, 2018 through July 17, 2018. She spent all of those days in Miami, alone, without her mother. After she was taken away from her mother, she did not have contact with her for over a month. She was sad and scared, and cried almost every day. While she was separated from her mother, D.B.G. was only given the chance to speak with her mother by phone two or three times, for about five minutes each time. A case manager at the shelter was present

and listened to every conversation she had with her mother. On July 17, 2018, per the court order from *Ms. L*, D.B.G. was reunified with mother. D.B.G. and her mom are now detained together in Dilley, Texas.

87.     D.B.G. has never received any paperwork from any immigration officers. She does not remember signing any documents regarding immigration. She has never been to immigration court, or had an interview with any asylum officer. During the time D.B.G. was separated from her mother, D.B.G.'s mother independently sat through the credible fear interview, which resulted in a negative finding, and she was issued an expedited order of removal. At the time of her interview, and because of the forcible separation from her daughter, D.B.G's mother was suffering from emotional distress so severe that she was unable to participate meaningfully in her interview. She was also denied the ability to consult with D.B.G. prior to the interview.

88.     After D.B.G. and her mother were reunified in Dilley, D.B.G. requested, through her attorney, the opportunity to explain their fear of returning to Honduras to immigration or asylum officers. D.B.G. and her attorney have not received a response to that request. D.B.G. is not independently subject to an expedited order for removal and is not named on the order issued to her mother. Nevertheless, upon information and belief, Defendants intend to deport D.B.G. along with her mother very soon.

89.     D.B.G. is afraid to return to Honduras because both a gang threatened to kill her to retaliate against her mother, who made a police report after the gang murdered D.B.G.'s second cousin. D.B.G. is also afraid of her father, who beat her, threatened to kill her and emotionally abused her, her entire life. D.B.G.'s mother came to the United States for the same reasons – she fears being killed by D.B.G.'s father and the gang.

90.    G.M.A. is a nine-year-old child seeking asylum in the United States. G.M.A. is from Honduras and traveled to the United States to seek asylum based on religious persecution. G.M.A.'s native language is Spanish. G.M.A. and her mother were apprehended and detained by border patrol agents when they crossed the border on June 12, 2018. Upon apprehension, G.M.A.'s mother expressed fear of returning to Honduras. Upon questioning, G.M.A.'s mother told an immigration official that she and G.M.A. were afraid to return to Honduras. The official did not ask G.M.A. any questions.

91.    G.M.A and her mother were taken to a place called the *perrera*, or dog pound, on June 14, 2018. G.M.A. was told that she had to be separated from her mother so her mother could "go to court." G.M.A. began to cry, and was made to stand in a line with other crying children. That day, G.M.A. was forcibly separated from her mother. G.M.A. was told that she would be separated from her mother for only two days. But G.M.A. would not see her mother for nearly forty days.

92.    G.M.A. remained in the *perrera* for four days after being separated. She then was taken to a shelter in New York where she was detained for 32 days. While detained, G.M.A. did not have contact with her mother for many days. While in New York, G.M.A. had a foster mother and foster siblings. But her foster siblings hit her. Her foster mother's cousin yelled at her and told her she would never see her mother again. G.M.A. cried often, and didn't know if she would ever see her mother again. During this time, and upon information and belief, G.M.A. was deemed and treated as an "unaccompanied minor." As an unaccompanied minor she would have been issued an NTA for proceedings under Section 240 of the INA. Although G.M.A. remembers signing various papers, nobody explained what the papers meant, and she did not understand them.

93.     On July 17, 2018, per the court order from *Ms. L*, G.M.A. was reunified with her mother.  By that time, however, G.M.A.'s mother had already independently sat through a credible fear interview and received an expedited order of removal.  At the time of her interview, G.M.A.'s mother was suffering from emotional distress so severe that she was unable to participate meaningfully in her interview.  She was also denied the ability to consult with G.M.A. prior to the interview.

94.     Through her attorney, G.M.A. requested the opportunity to explain her fear of returning to Honduras to immigration or asylum officers, but G.M.A. and her attorney have not received a response to that request.  G.M.A. is not independently subject to an expedited order for removal and is not named on the order issued to her mother.  Nevertheless, upon information and belief, Defendants intend to deport G.M.A. along with her mother as soon as possible.

95.     G.M.A. and her mother are Mormons.  G.M.A. is afraid to return to Honduras because her mother was harmed by "bad people" because of their religion.  The same "bad people" have also threatened to hurt G.M.A.  The people who hurt G.M.A.'s mother believe that she reported them to the police.  G.M.A. feels that she and her mother will be in danger if they have to return to Honduras.

96.     A.M.C. is a seven year-old child seeking asylum in the United States.  A.M.C. is from Honduras and traveled to the United States to seek asylum because he and his mother fear for their safety in Honduras.  A.M.C.'s native language is Spanish.

97.     A.M.C. and his mother were apprehended by border patrol agents upon entry into the United States.  Upon apprehension, A.M.C. and his mother were taken to a place called the *hielera,* or ice box.  He and his mother were kept at the *hielera* for many days.  There was no bed in the *hielera*, and he was cold and hungry the entire time he was there.  A.M.G. was with his

mother in the *hielara,* and she hugged him to keep him warm, but he remained cold. One day, an official took him and his mother out of their cell, and asked his mother some questions. A.M.C. is unaware of the questions his mother was asked, and he was not asked any questions himself.

98.     After that, A.M.C. and his mother were taken to the *perrera,* or dog pound, where they were put into a cage together. They slept on the floor of the cage for four days. One day in May, A.M.C. was separated from his mother. He was driven to a shelter in Texas by a man and a woman. He did not see his mother again for 50 days. While at the shelter, A.M.C. did not speak to his mother for many days. He was eventually allowed to speak to her on the telephone and ask her why she did not come to visit him. At the shelter, there were women that the children called "Miss" who took care of A.M.C. and the others children. A.M.C. felt sad and missed his mother while they were apart.

99.     On July 17, 2018 (a day before his seventh birthday), per the court order from *Ms. L*, A.M.C. was reunified with his mother. A.M.C. was provided with a lot of paperwork when he was placed in the shelter but he does not know what those papers were, nor does he know how to locate those papers. The papers were taken away from A.M.C., and he does not know how to get them back. A.M.C.'s mother has been issued an expedited order of removal as a result of a negative finding from her credible fear interview. Through their attorney, A.M.C. requested the opportunity to explain their fear of returning to Honduras to immigration or asylum officers, but A.M.C. has not received a response to that request. A.M.C. is not independently subject to an expedited order for removal. Nevertheless, upon information and belief, Defendants intend to deport A.M.C. along with his mother.

100.     A.M.C. is afraid to return to Honduras because he fears for his life. Before fleeing Honduras, individuals shot bullets at his house and threw a bomb at his house, in an

attempt to kill his family. A.M.C. is also afraid to return to Honduras because his father abuses him and he does not feel safe living with him.

101.    L.A.A. is a 10-year-old child seeking asylum in the United States. L.A.A. is from Guatemala and traveled to the United States seeking safety because a gang attempted to kill her and her mother after her mother complained to the police about L.A.A. being sexually abused by her grandfather. L.A.A.'s native language is Spanish.

102.    L.A.A. and her mother were apprehended at the border on June 14, 2018, and placed in the *hielera*. L.A.A. and her mother were hungry, tired, cold, and afraid. L.A.A. told an immigration officer that she was afraid to go back to Guatemala. The officer yelled at her and did not believe her. Later that same day, an immigration official told her they were going to put L.A.A. up for adoption. Two days later, L.A.A. was forcibly separated from her mother and taken to the *perrera*. She was afraid and she cried. L.A.A. was taken to Raymondville, TX where she was detained for 35 days with minimal contact from her mother. L.A.A. felt sick being separated from her mother. Upon information and belief, L.A.A. was deemed and treated as an "unaccompanied minor" as of the time of her separation. Upon information and belief, she was issued an NTA for removal proceedings under Section 240.

103.    On July 23, 2018, per the court order from *Ms. L*, L.A.A. was reunified with mother in Dilley. Even still, L.A.A. is afraid every day that someone will take her mother away. By the time of their reunification, L.A.A.'s mother had already sat through the credible fear interview and was issued an expedited order of removal. Through their attorney, L.A.A. requested the opportunity to explain their fear of returning to Guatemala to immigration or asylum officers, but L.A.A. has not received a response to that request. It is very hard for L.A.A.

to talk about everything that has happened to her. When someone asks her why she is afraid, she starts to cry and cannot stop. She needs her mother to explain everything for her.

104.    L.A.A. is not independently subject to an expedited order for removal and is not named on the order issued to her mother. Nevertheless, upon information and belief, Defendants intend to deport L.A.A. along with her mother. L.A.A. is afraid to return to Guatemala. She wants to stay in the United States where she and her mother will be safe from the gang and from her grandfather. She wants to apply for asylum.

105.    Each of the above Plaintiffs faces an immediate threat of irreparable harm from Defendants' imminent removal of Plaintiffs – without the opportunity to exercise their rights under the INA to seek asylum, and without due process – to a country where they face a real fear of persecution. Defendants' unlawful conduct should be enjoined.

## CLASS ACTION ALLEGATIONS

106.    Plaintiffs bring this lawsuit challenging the Government's policy of denying migrants the right to pursue asylum individually and on behalf of a proposed nationwide class under Federal Rules 23(b)(2) and 23(c)(4) consisting of all non-citizens under the age of 18 who were separated from their parents or guardians upon (or after) entry into the United States and who are, have been, or will be detained by the U.S. government at any time since January 1, 2018.

107.    The proposed class consists of hundreds of children detained throughout the United States, rendering it impracticable to join all class members before the Court. There are substantial questions of law or fact common to all class members, including the particular issue of whether class members have a statutory and constitutional right to apply for asylum in the

United States.  The requested injunctive and declaratory relief is appropriate respecting the class as a whole because all class members have these rights to apply for asylum.

## CAUSE OF ACTION

### COUNT I
### (Violation of Due Process under the Fifth Amendment to the Constitution)
### (Against All Defendants)

108.    Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 107 above, as though fully set forth herein.

109.    "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. at 693 (internal quotation omitted).  Thus, the Due Process Clause applies to Plaintiffs.

110.    Thus, "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to . . . due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).  Here, Defendants are preparing to expel Plaintiffs and other minor children like them without affording them any process at all.  Indeed, none of Plaintiffs even has a final order of removal.

111.    In addition, "an alien who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for political asylum and a statutory procedural due process right to a meaningful or fair evidentiary hearing." *Gutierrez-Rogue v. Immigration & Naturalization Serv.*, 954 F.2d 769, 772-73 (D.C. Cir. 1992) (citing *Maldonado-Perez v. Immigration & Naturalization Serv.*, 865 F.2d 328, 332–33 (D.C. Cir. 1989)).  As explained above, Plaintiffs have been afforded no process through which to seek asylum.  Defendants initially decided to place Plaintiffs in removal proceedings under Section

240, and the process that Section 240 provides for seeking asylum. But the U.S. government revoked that opportunity on the basis of the parents' invalid waivers. Thus, Plaintiffs received no process under Section 240.

112.    Now that Plaintiffs and other children have been reunified with their parents, who separately went through expedited removal proceedings under Section 235, Defendants have even denied Plaintiffs the opportunity to their own credible fear interview under Section 235. Thus, Plaintiffs have been foreclosed from any ability to be heard on their asylum claim. This plainly violates their Fifth Amendment right to procedural due process.

113.    Moreover, minor children who are too young to participate in the credible fear process rely on their parents to seek asylum on their behalf, and all minor children are entitled to the benefit of a parent's positive result, through the "linking" of cases, in a credible fear interview. Thus, many children access these asylum procedures through their parents. However, separated parents were forced to undergo credible fear interviews while under incredible emotional distress caused by the forcible separation from their children. And separated parents were denied the ability to consult with their children in preparation for credible fear interviews, to obtain any information that is relevant to the parents' claim of fear. These realities rendered the parents' credible fear interviews fundamentally unfair. Because many children's access to asylum procedures derives from their parents, the unfairness of the parents' interviews violates the procedural due process rights of the child.

114.    Plaintiffs' due process rights are further implicated by the involuntary, uninformed and unknowing nature in which the U.S. government has secured "waivers" of Plaintiffs' rights, as neither Plaintiffs nor their parents fully understood the Removal Form and

Plaintiffs parents were coerced into completing the form in order to regain their rightful custody of their child.

115.    The Supreme Court has clearly stated that aliens "may be expelled only after proceedings conforming to . . . due process of law." *Mezei*, 345 U.S. at 212.  The planned deportations fail that test because the U.S. government has foreclosed all avenues for Plaintiffs to petition for asylum under the.

**COUNT II**
**(Petition for a Writ of Mandamus, 28 U.S.C. § 1361)**
**(Against All Defendants)**

116.    Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 115 above, as though fully set forth herein.

117.    Under U.S. law, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

118.    Obtaining a writ of mandamus requires satisfaction of three elements: (1) the plaintiff has a clear right to the relief sought, (2) the defendant has a duty to do the act in question, and (3) no other adequate remedy is available. *Id.*

119.    Section 235 of the INA sets forth non-discretionary procedures that the Attorney General must follow before removing a non-citizen who has been in the United States for fewer than 14 days and who was apprehended fewer than 100 miles from the United States border.  8 U.S.C. § 1225(b)(1)(A)(ii).

120.    Specifically, Section 235 states that if a non-citizen indicates either intent to apply for asylum or expresses a fear of persecution, the immigration officer "shall" refer the non-citizen for a credible fear interview before an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii).  If

the asylum officer determines that the non-citizen does, in fact, have a credible fear of persecution in his or her home country, the non-citizen is granted the right to access meaningful procedures through which to apply for asylum in the United States in Section 240 proceedings.

121.    The word "shall" as used in INA Section 235 establishes a mandatory, non-discretionary duty. *See Iddir v. Immigration & Naturalization Serv.*, 301 F.3d 492, 499 (7th Cir. 2002) ("[t]he term 'shall' denotes a clear directive, a command, as opposed to the terms 'may' or 'in his discretion.'").  As such, Plaintiffs have a clear right to a credible fear interview if they express either an intent to apply for asylum or a fear of persecution in their country; and if they successfully establish a credible fear in that interview, Plaintiffs have a right to seek asylum through proceedings under INA Section 240.  Moreover, Defendants have a mandatory, non-discretionary duty to provide Plaintiffs with a credible fear interview if they have indicated an intent to apply for asylum or a fear of persecution.

122.    Defendants have failed to carry out that duty.  They have failed to provide Plaintiffs with a credible fear interview, even though Plaintiffs have triggered the non-discretionary duty outlined at INA Section 235.  Now, upon information and belief, Defendants are preparing to deport these children without ever giving them access to the credible fear procedures to which they are legally entitled.

123.    Because Plaintiffs have a clear right to access the credible fear process, Defendants have a non-discretionary duty to provide them access to that process.  Moreover, there is no adequate remedy apart from ordering Defendants to carry out their duty under the INA.  Accordingly, Plaintiffs are entitled to mandamus relief.

**COUNT III**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(a))**
**(Against All Defendants)**

124.    Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 123 above, as though fully set forth herein.

125.    Under the APA, federal courts have the authority to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5. U.S.C. § 706(2)(A). A court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

126.    Removal of Plaintiffs and other minor children from proceedings under Section 240 on the basis of coercive and misleading waiver forms was "arbitrary, capricious, [and] an abuse of discretion," and it was "not in accordance with law." Apart from the invalidity of the waivers themselves, there is no statutory or regulatory authority for Defendants to remove a minor child from proceedings under Section 240 and then deport such minor with no final order of removal. After Defendants placed Plaintiffs in removal proceedings under Section 240, Plaintiffs were entitled to remain in such proceedings and be reunited with their parents pursuant to *Ms. L.*

127.    Even assuming *arguendo* that Defendants could lawfully remove Plaintiffs from proceedings under Section 240, Plaintiffs are at least entitled to the procedural protections outlined in Section 235 of the INA prior to being deported. Section 235 contains non-discretionary procedures that the Attorney General must follow before expeditiously removing certain adult aliens and families. Specifically, Section 235 states that if an alien "indicates either an intention to apply for asylum . . . or a fear of persecution, the officer *shall* refer the alien for an interview by an asylum officer" for a credible fear interview. 8 U.S.C. § 1225(b)(1)(A)(ii)

(emphasis added).  Thus, U.S. government officials have a non-discretionary duty to refer an alien for a credible fear interview if he or she indicates an intent to apply for asylum or fear of persecution.

128.    Here, Plaintiffs have expressed a fear of repatriation or indicated a desire to apply for asylum, thereby triggering the credible fear interview process.  As described above, Plaintiffs have not been given access to such interviews.  Upon information and belief, the U.S. government is currently preparing to deport Plaintiffs and their parents without giving Plaintiffs access to the credible fear interview process or other process afforded them by law under either Section 235 or 240 of the INA.

129.    Defendants' policy of denying credible fear interviews to Plaintiffs, and their plan to deport Plaintiffs without such interviews or any final removal orders, is "not in accordance with" the procedures mandated by the INA and this Court is authorized to set this policy aside. 5. U.S.C. § 706(2)(A).

130.    The U.S. government's denial of access to required asylum proceedings, and current plans to imminently deport Plaintiffs without any further proceedings, constitutes "final agency action" reviewable by the Court.  Such actions are not tentative or interlocutory and, once executed, preclude the children from seeking or obtaining any other form of relief or review of the decision.

## COUNT IV
### (Judicial Review of Expedited Removal Policy)
### (Against All Defendants)

1.      Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 130 above, as though fully set forth herein.

2.      The U.S. government's policy of denying Plaintiffs their rights to pursue asylum in the United States is inconsistent with Section 240 and/or Section 235 of the INA and is otherwise in violation of the law.  That policy is reflected in written statements and directives including but not limited to the DHS Fact Sheet, which states that the reunification process is designed "to ensure that those adults who are subject to removal are reunited with their children *for the purposes of removal.*"[14]

3.      Pursuant to this policy, Plaintiffs' requests for credible fear interviews have been unlawfully denied, and Plaintiffs face an imminent threat of deportation without access to asylum proceedings.  Plaintiffs are entitled to relief from Defendants' unlawful policy under 8 U.S.C. 1252(e)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court to grant the following relief:

a) A temporary restraining order that preserves the status quo by enjoining Defendants from deporting any reunified families until Plaintiffs' and the putative class' claims are adjudicated on the merits;

b) Issuance of an Order declaring that Defendants' actions violate the APA, INA, and/or Fifth Amendment Due Process Clause because of Defendants' unlawful refusal to provide

---

[14]     Dep't of Homeland Security, *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification (emphasis added).

Plaintiffs and the putative class the right to pursue or have heard their individual asylum claims or to be consulted in their families' joint claims;

    c)  Issuance of an Order declaring that Plaintiffs and the putative class have a right to pursue their own asylum claims in removal proceedings under INA Section 240 with the assistance of a parent or guardian and, in addition, that Plaintiffs and the putative class have a right to a credible fear interview under INA Section 235 with the assistance of a parent or guardian;

    d)  Issuance of an Order declaring that Plaintiffs and the putative class have a right to their parent or guardian receiving a fundamentally fair credible fear interview free from the distress of family separation and with the ability to consult with their child before the interview;

    e)  Issuance of a writ of mandamus requiring Defendants' compliance with the terms of Section 235 of the INA, including requiring that Defendants provide Plaintiffs and the putative class access to credible fear interviews to pursue their asylum claims;

    f)   Determination that this action may be maintained as a class action pursuant to Federal Rules 23(b)(2) and 23(c)(4); direction that reasonable notice be provided to the class pursuant to Federal Rule 23(c)(2); a declaration that Plaintiffs are representatives of the class; and a declaration that Plaintiffs' counsel are class counsel;

    g)  Such other and further relief as this Court may deem just and appropriate, including but not limited to the mental health treatment, alternatives to detention, and other compensation or equitable relief necessary to restore Plaintiffs and the putative class to their position but for Defendants' unlawful conduct.

Dated: July 27, 2018                    Respectfully submitted,

                                    **HOGAN LOVELLS US LLP**

By: _____

Justin W. Bernick (DC Bar No. 988245)
*T. Clark Weymouth
*Zachary W. Best
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com
t.weymouth@hoganlovells.com
zachary.best@hoganlovells.com

*Ira M. Feinberg
*Oliver J. Armas
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
oliver.armas@hoganlovells.com
ira.feinberg@hoganlovells.com

*Katherine A. Nelson
1601 Wewatta Street, Suite 900
Denver, CO 80202
Telephone: (303) 454-7300
Facsimile: (303) 899-7333
katherine.nelson@hoganlovells.com

* *admission pro hac vice to be sought*

*Counsel for Plaintiffs*